#30488
**2024 S.D. 11**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

#30488

IN RE: THE REQUEST OF SOUTH DAKOTA GOVERNOR
KRISTI NOEM FOR AN ADVISORY OPINION IN THE MATTER OF
INTERPRETATION OF SOUTH DAKOTA CONSTITUTION AND
STATE LAWS REGARDING STATE LEGISLATOR'S INTEREST
IN STATE OR COUNTY CONTRACTS

* * * *

ORIGINAL PROCEEDING

* * * *

ARGUED
JANUARY 8, 2024
OPINION FILED **02/09/24**

#30488

AN OPINION REQUESTED BY HER EXCELLENCY, KRISTI NOEM, THE
GOVERNOR OF THE STATE OF SOUTH DAKOTA, PURSUANT TO ARTICLE V,
§ 5 OF THE SOUTH DAKOTA CONSTITUTION

SALTER, Justice

[¶1.] Citing Article V, § 5 of the South Dakota Constitution, Governor Kristi Noem has asked for an advisory opinion on nine individual and fact-specific questions concerning the constitutional restriction upon legislators contracting with the State, as set out in Article III, § 12. Both the Attorney General and the leadership of the Legislature submitted letters expressing approval for the Governor's request and the need for clarification concerning Article III, § 12. We issued an order directing separate briefs from the Governor, the Legislature, and the Attorney General and now provide the following response.

**Background**

[¶2.] As explained more fully below, Article III, § 12 of our Constitution prohibits legislators from being "interested, directly or indirectly, in any contract with the state or any county thereof, authorized by any law passed during the term for which he shall have been elected." The current state of our decisional law interpreting this provision provides that the Legislature's general appropriation bill separately *authorizes* virtually all State contracts. *See Asphalt Surfacing Co. v. S.D. Dep't Transp.*, 385 N.W.2d 115, 117 (S.D. 1986). As a consequence, individual legislators have become increasingly concerned about whether their private interests violate the Constitution if they are connected in some way to general appropriation legislation.

-1-

#30488

[¶3.] In her request, the Governor states that many people, including legislators, potential legislative candidates, along with "fiscal and program staff, across state and county governments and within constitutional offices," have expressed uncertainty about the rules relating to State contracts involving legislators and have asked that she request "an interpretation of [the] contract section of Article III, Section 12." Governor Noem also states that the lack of clarity impacts her ability to exercise her appointment power to fill two current vacancies in the Legislature.

[¶4.] The Governor poses the following nine specific questions and asks for our opinion about whether the factual scenarios she describes violate the restriction upon legislator contracts with the State set out in Article III, § 12 of our Constitution:

1. May a vendor of the state receive a state payment if that vendor employs a legislator, and such legislator is not an owner of the vendor?

2. May a vendor of the state receive a state payment if that vendor is a publicly traded company, and a legislator owns any shares [of] stock in such vendor?

3. May a legislator be a state, county, city, or school district employee, either full time, part time, or seasonal, or an elected or appointed official?

4. May a legislator receive retirement compensation from the South Dakota Retirement System for services rendered other than acting as a legislator?

5. May a legislator or a business owned by a legislator subcontract for payment, goods, or services provided to or from the state?

6. May a legislator or a business owned by a legislator receive Medicaid reimbursements administered by a state agency?

-2-

7. May a legislator receive an expense reimbursement for foster children in their care administered by a state agency?

8. May a legislator or a business owned by a legislator purchase or receive goods or services, including state park passes, lodging, and licenses, from the state when such goods or services are offered to the general public on the same terms?

9. How do the instances detailed above apply to a legislator's spouse, dependent, or family member?

[¶5.] The Governor's brief notes the singular nature of the general appropriation bill and seems to suggest that a legislator's interest in a State contract may, at some point, become too indirect to come within the scope of Article III, § 12, without regard to whether a general appropriation bill authorizes specific contracts, as we held in *Asphalt Surfacing*. At oral argument, counsel for the Governor stated the Governor's questions were not prompted by a preference for a particular result concerning the interpretation of Article III, § 12 but, rather, by the necessity for greater clarity in its application.

[¶6.] The Attorney General's brief holds fast to our existing precedent that prohibits all contracts with legislators involving funds appropriated in a general appropriation bill. But the Attorney General also suggests something less than a categorical bar for instances in which a legislator's interest in a State contract may be too remote or when the legislator is similarly situated to a member of the public.

[¶7.] The Legislature's brief is much different. It asserts that *Asphalt Surfacing* represents a fateful break from the text of Article III, § 12, which prohibits only contracts "authorized" during a legislator's term in office—something a general appropriation bill cannot do. As support, the Legislature identifies Article

XII, § 2 of the Constitution, which restricts the effect of general appropriation legislation to nothing more than setting money aside to fund the "ordinary" and "current" expenses of state government. The Legislature asks us to overrule *Asphalt Surfacing* in favor of a limited view of general appropriation and what it believes to be a more faithful reading of Article III, § 12.

[¶8.] Though we refer to the Legislature as a single interested party, it is important to note that members of the Legislature are not universally aligned with the views expressed in the Legislature's brief, which was commissioned by the leaders of the Senate and the House of Representatives. In a letter brief submitted on behalf of several individual legislators, Representative Jon Hansen disagreed with the Legislature's position and stated that, if it were accepted, "the overwhelming majority of state spending would fall outside the Constitutional conflict of interest protections contained in Article 3, Section 12."

## Analysis and Opinion

### *Original jurisdiction to answer the question presented*

[¶9.] Article V, § 5 of our Constitution gives the Governor "authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of [her] executive power and upon solemn occasions." We have interpreted the text of Article V, § 5 disjunctively to allow advisory opinions in instances involving the exercise of the Governor's executive power or those which present solemn occasions. *See In re Constr. of Article III, Section 5, of the S.D. Const.*, 464 N.W.2d 825, 826 (S.D. 1991) ("[T]his constitutional provision was never intended to be called into requisition unless some 'important question of law' was

involved in the exercise of executive functions, or upon 'solemn occasions[.]'"

(quoting *In re Constr. of Const.*, 3 S.D. 548, 551, 54 N.W. 650, 651–52 (1893))).

[¶10.] As part of our effort to determine cognizability under Article V, § 5, we must first consider the nature of the nine questions set out above.[1] Initially, these nine individual interrogatories seem to refer to particular, fact-bound circumstances involving individual legislators.[2] There is, in other words, no expressly stated issue of broad public concern. We also lack a fully developed evidentiary record that could, in any of the nine questions, profoundly impact an analysis. We are principally a reviewing court, of course, with limited original jurisdiction under Article V, § 5 and ill-equipped to find facts as a trial court does. We are also prohibited, as all courts are, from speculating about unknown facts.

[¶11.] But still, taken collectively, the nine questions illustrate the essence of the Governor's concern and reflect an unmistakable overarching inquiry into the circumstances under which a legislator's private interests conflict with service in the Legislature under the contract clause of Article III, § 12.[3] During oral

---

1. The Governor, the Legislature, and the Attorney General have each argued that the current request is sufficient to authorize the exercise of our original jurisdiction to provide an advisory opinion.

2. We have previously declined to answer a question where it was presented by the Legislature through the Governor, stating the Governor's ability to require an advisory opinion from the Court "is confined exclusively to such questions as may raise a doubt in the executive department[]—never in the legislative." *Constr. of Const.*, 3 S.D. 548, 54 N.W. at 652.

3. In his brief, the Attorney General suggests that Article III, § 12 may also be implicated where a legislator has a non-pecuniary interest in a State contract. We express no opinion in this regard and confine our analysis to

(continued . . .)

argument, counsel for the Governor, as well as the Attorney General and the Legislature's lawyer, all agreed that we may restate questions posed by the Governor in our effort to determine whether we have authority to render an advisory opinion under Article V, § 5. We agree and reformulate the questions presented by the Governor's request into one question as follows:

> Whether Article III, § 12 prohibits all contracts between legislators and the State.[4]

### *Exercise of executive power*

[¶12.] In our 2016 response in *In re Daugaard*, we used a formulation developed by Justice Wollman as the standard for determining whether a request for an advisory opinion sufficiently implicates the exercise of the Governor's executive power:

> [We should] reserve answer to requests for advisory opinions to those situations in which the exercise of the Governor's executive power will result in immediate consequences having an impact on the institutions of state government or on the welfare of the public and which involve questions that cannot be answered expeditiously through usual adversary proceedings.

2016 S.D. 27, ¶ 9, 884 N.W.2d 163, 166 (quoting *In re Op. of the Sup. Ct. Relative to the Constitutionality of Ch. 239, Session Ls. of 1977*, 257 N.W.2d 442, 447 (S.D. 1977) (Wollman, J., concurring specially)).

_____

(. . . continued)

the interests described in the Governor's questions, which appear distinctly oriented to economic interests in State contracts.

4.    Though we decline to answer the individual questions that seem focused on the degree or extent of a legislator's interest in a State contract, we believe that our ultimate answer set out below will provide important guidance on those specific questions, most or all of which require additional factual development.

[¶13.] Here, the Governor states that there are currently two vacancies in the Legislature, and in the exercise of her constitutional authority to fill these vacancies, she must be cognizant of the rules relating to contracts between legislators and the State. Under our cases, this justification alone is sufficient to implicate the Governor's executive power.

[¶14.] In an unpublished response to Governor Rounds in 2009, we declined to answer questions relating to eligibility to serve as a member of the Supreme Court because there was, at the time, no vacancy on the Court. *In re Request of Governor M. Michael Rounds for an Advisory Op. in the Matter of the Interpretation of S.D. Const. Article V, Section 5*, #25467, December 3, 2009 (unpublished). Later, however, in 2011, there *was* a vacancy, and we agreed to answer Governor Daugaard's question relating to the constitutional requirement stated in Article V, § 2 that members of the court "shall be selected from compact districts[.]" *In re Daugaard*, 2011 S.D. 44, ¶ 7, 801 N.W.2d 438, 440.

[¶15.] We explained that Governor Daugaard was "required" under Article V, § 7 of the Constitution "to exercise [his] executive power and appoint a nominee to the Supreme Court vacancy." *Daugaard*, 2011 S.D. 44, ¶ 5, 801 N.W.2d at 440. "The action" that Governor Daugaard would ultimately take, we observed, would "be affected by our answer to the questions [he] pose[d]." *Id.*

[¶16.] The same analysis applies here. Governor Noem is required by Article III, § 10 to "make appointments to fill such vacancies as may occur in either house of the Legislature." The Legislature is a distinct branch of our constitutional form of government and exercises comprehensive power to enact laws for the general

welfare of our state's citizens. *See Gray v. Gienapp*, 2007 S.D. 12, ¶ 22, 727 N.W.2d 808, 813 ("[E]xcept as limited by the state or federal constitutions, the *legislative power of the state legislature is unlimited*." (quoting *Breck v. Janklow*, 2001 S.D. 28, ¶ 9, 623 N.W.2d 449, 454) (emphasis added)). The Governor's sole executive power to fill the existing vacancy by appointment is profoundly impacted by our interpretation of Article III, § 12, and this itself is sufficient to invoke our authority under Article V, § 5 to issue an advisory opinion.

***Solemn occasion***

[¶17.] As reformulated, we believe the question before us also constitutes a solemn occasion under Article V, § 5. We have identified eight factors to guide our determination of whether a question constitutes a solemn occasion:

> [1] whether an important question of law is presented, [2] whether the question presents issues pending before the Court, [3] whether the matter involves private rights or issues of general application, [4] whether alternative remedies exist, [5] whether the facts and questions are final or ripe for an advisory opinion, [6] the urgency of the question, [7] whether the issue will have a significant impact on state government or the public in general, and [8] whether the Court has been provided with an adequate amount of time to consider the issue.

*Daugaard*, 2016 S.D. 27, ¶ 13, 884 N.W.2d at 167 (citing *In re Janklow*, 530 N.W.2d 367, 369 (S.D. 1995)).

[¶18.] We believe that an important question of law is presented here, though not exactly for the reasons identified by the Governor and the Attorney General. The general question of degree discussed in their briefs—whether a legislator's interest in a State contract can be so attenuated as to not violate Article III, § 12— is secondary to the primary question of whether the contract is even one that falls

within the textual restriction of the Constitution. As the Legislature asserts in its brief, this fundamental legal issue lies at the heart of a proper understanding of Article III, § 12.

[¶19.] Further, the Governor's request does not implicate other issues pending before us, and, as it is restated, the question is one of general application and not of private rights or interests. We note that alternative remedies do exist; most of our other decisions involving Article III, § 12 have involved efforts by a legislator/contractor to be paid for contracted work. However, our 2020 decision in *In re Noem* is a recent and notable exception. 2020 S.D. 58, 950 N.W.2d 678. In *Noem*, we concluded that the request asking whether legislators were eligible to receive grant money through a program authorized by the Legislature and administered by the Governor presented a solemn occasion, in addition to involving the exercise of the Governor's executive powers. *Id.* ¶ 8, 950 N.W.2d at 680.

[¶20.] In our view, the remaining factors also support our belief that the current request presents a solemn occasion. The question seeking an interpretation of Article III, § 12 is ripe for consideration. Our prompt resolution of this legal issue will settle unremitting questions about § 12's meaning, which if left unresolved under the current state of the law, would have a negative impact upon state government and the public. *See id.* ¶ 10, 950 N.W.2d at 681 (finding the Governor's Article III, § 12 question "raises a broader conflict of interest question involving a legislator's entitlement to appropriated funds, which is an issue with significant impact on State government and public perceptions associated with the distribution of such an extraordinarily large sum of money").

[¶21.]     We also believe we have had sufficient time to undertake our deliberative process. The question we confront here, though persistent, is not new or emergent, and we are not rendering an opinion based solely upon the contents of the Governor's written request. Instead, we have utilized traditional procedures generally associated with appellate litigation to assist us in our understanding of the legal issue we confront. These included our order directing written briefs and setting the case for oral argument.[5]

### *The contract clause of Article III, § 12*

[¶22.]     Article III, § 12 of the Constitution contains several separate, free-standing provisions. The first prohibits legislators from serving in "any civil office" that was created or for which the emoluments were increased during a legislator's term. Also prohibited under this provision are "appointment[s] from the Governor, the Governor and senate, or from the Legislature during" a legislator's term. S.D. Const. art. III, § 12. These restrictions are not at issue in this case, which is, instead, focused exclusively upon the last clause of Article III, § 12—a provision relating to contracts authorized by the Legislature:

> [N]or shall any member of the Legislature during the term for which he shall have been elected, or within one year thereafter, be interested, directly or indirectly, in any contract with the state or any county thereof, authorized by any law passed during the term for which he shall have been elected.

*Id.*

---

5.     Our process has also been an open one. In our order directing briefs, we expressed our willingness to consider amicus curie, or friend of the court, briefs.

[¶23.]     At the outset, we note that the contract clause in Article III, § 12 does not contain a categorical prohibition upon contracts between legislators and the State; nor does it indiscriminately proscribe all connections between a legislator and State funds.  The text simply does not support either view.

[¶24.]     Instead, Article III, § 12 imposes a temporal restriction upon contracts which are authorized by a law passed during a legislator's term.  For these contracts, a legislator or an affected former legislator may not be interested, directly or indirectly.

[¶25.]     Our cases interpreting the contract clause of Article III, § 12 are somewhat of a variegated assortment.  At times, we have regarded the text of § 12 as our preeminent source for determining its meaning.  At other times, however, we have discussed Article III, § 12 less as a judicial effort to interpret the contract clause's text and more as an exposition of the policies we believe it furthers.

[¶26.]     For example, in *Palmer v. State*, the plaintiff was a serving legislator who sought payment for work he had performed as an attorney for the Board of Railroad Commissioners.  11 S.D. 78, 75 N.W. 818 (1898).  Though the Board's litigation budget was funded through the general appropriation law, we focused on special legislation that specifically "authorized" the Board to engage counsel "when . . . it is necessary and proper."  *Id.* at 819.  We held that the resulting contract was invalid because the "*statute* . . . clearly clothed [the Board] with such authority . . . [and] created a contract with the state" in violation of Article III, § 12.  *Id.* (emphasis added).

[¶27.] Frankly, we included other statements about Article III, § 12, which suggested a broader, policy-based view of the contract clause. We noted, accurately enough, that the constitutional provision was a reform-minded effort by the framers of our Constitution to eliminate corrupt practices before they start by "remov[ing] any suspicion which might otherwise attach to the motives of members who advocate the creation of new offices or the expenditure of public funds." *Palmer*, 11 S.D. 78, 75 N.W. at 819. But in a series of statements, none of which was central to our holding, we also stated:

> The purpose of [Article III, § 12] is apparent. It is intended to preclude the possibility of any member deriving, directly or indirectly, *any pecuniary benefit from legislation enacted* by the legislature of which he is a member.
>
> . . .
>
> *All contracts* between the state and members of the legislature made during the prohibited period are invalid . . . .

*Id.* (emphasis added).

[¶28.] Unfortunately, these broad statements of policy in *Palmer* were too ambitious to be supported by the text of Article III, § 12. By its terms, the provision applies to contracts that were "authorized" during the prohibited period of a legislator's service, not to all enacted legislation or even all contracts. S.D. Const. art. III, § 12.

[¶29.] We next confronted a case involving Article III, § 12 in *Norbeck & Nicholson Co. v. State* (*Norbeck I*), which concerned a contract authorized by a special appropriation bill to sink and construct a well at what is now the University of South Dakota. 32 S.D. 189, 142 N.W. 847 (1913). Both the State Auditor and the

contractor, whose president was serving in the Legislature, agreed that the State contract violated § 12. However, the contractor argued it should, nevertheless, be paid by the State under a quantum meruit theory. We rejected the argument, concluding that a legislator occupied a fiduciary role relative to the State and that "it is against sound public policy to permit such an agent . . . to himself be directly or indirectly interested in any contract with the state or other municipality, during the period of time of the existence of such trust and confidential relationship." *Id.* at 849.

[¶30.]     In a concurring opinion, however, Presiding Judge Whiting disagreed with this reasoning and offered a keen analysis of Article III, § 12's text:

> The only contract that a legislator is forbidden to enter into with the state is a contract *authorized by a law passed while he was a legislator*. Even while a member of the Legislature, he is as free as any other person to enter into other contracts with the state. . . . [T]his constitutional provision was enacted through fear that a legislator might be, either consciously or unconsciously, influenced by selfish motives when voting for or against a bill. If there were no danger that a legislator's vote might be so influenced, there would be absolutely no more reason to forbid his entering into a contract authorized by the Legislature of which he was a member than to forbid his entering into any other contract with the state.

*Norbeck I*, 142 N.W. at 853 (Whiting, P.J., concurring).[6]

[¶31.]     Undeterred, the legislator/contractor renewed the effort for payment by next alleging that the money originally allocated by the special appropriation

---

6.     Though his analysis is helpful, Presiding Judge Whiting's references to a legislator's vote are not grounded in the text of Article III, § 12. The restriction applies to contracts that were authorized by a law passed *during the legislator's term*; it does not merely relate to laws for which the legislator casts a vote.

included in the authorizing legislation for the well-drilling project "has been entirely exhausted" by the cost of necessary equipment and that the Board of Regents had sufficient "moneys derived from other sources" to pay the contractor. *Norbeck & Nickolson Co. v. State* (*Norbeck II*), 33 S.D. 21, 144 N.W. 658, 659 (1913). Implicitly relying upon Presiding Judge Whiting's uncomplicated interpretation of Article III, § 12 from *Norbeck I,* we again rejected the legislator/contractor's request for payment, this time holding:

> The contract upon which plaintiff seeks recovery was authorized by a legislative act, and is within the very language of the Constitution which says that no member of the legislative assembly shall be interested, directly or indirectly, in any contract authorized by a law passed during the term for which he shall have been elected.

*Norbeck II*, 144 N.W. at 659.

[¶32.] So, despite some unnecessary dicta in *Palmer* and the need for what the Legislature's brief labels a "course correction" in *Norbeck II*, our view of Article III, § 12, for most of the twentieth century, remained closely aligned with its text.[7] We focused the prohibition at the point of legislative authorization, which, in *Palmer* and the *Norbeck* opinions, had come in the form of special legislation that specifically authorized the contracts at issue. That changed in 1986.

---

7. The dissent asserts that *Palmer* contains "persuasive evidence of original meaning and intent" that we have "disregard[ed.]" But the *Palmer* opinion does not interpret Article III, § 12 in a way that is unique to its time. The anti-corruption purpose of the contract clause was as apparent in 1898 as it is today. In fact, *Palmer* does not purport to base its holding on anything other than the text of Article III, § 12, which the opinion describes as "plain." 11 S.D. 78, 75 N.W. at 819. And in any event, whatever value the dissent believes the *Palmer* dicta has, it must be tempered with Presiding Judge Whiting's textual analysis of the contract clause in *Norbeck I* and the subsequent *Norbeck II* decision, both of which hearken back to the same era.

#30488

[¶33.]     In *Asphalt Surfacing*, a highway contractor owned by a legislator's company sought payment under a contract with the Department of Transportation. We identified the principal question as "whether passage of a general appropriation bill is the type of authorization contemplated by [Article III, § 12]." 385 N.W.2d at 117. Our answer was spare:

> Article III, section 12 specifically prohibits a contract with the State if "authorized by *any* law" during the legislator's term. Our constitutional framers obviously intended a broad prohibition. *Palmer*, 11 S.D. at 80–81, 75 N.W. at 819. This leaves little question that section 12 applies to a general appropriation bill as well as more specific legislative decisions.

*Id.* at 118.

[¶34.]     The final sentence of this excerpt is particularly problematic because it abruptly conflates legislative authorization to enter into a specific contract with generally funding state government. But these are different concepts within our Constitution and cannot be used interchangeably.

[¶35.]     Under a different provision of our Constitution, Article XII, § 2, the Legislature's general appropriation legislation does not—and, indeed, cannot—accomplish anything beyond the unadorned act of appropriating money to fund state government generally:

> The general appropriation bill shall embrace nothing but appropriations for ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt, and for common schools. All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature.

[¶36.]    In *State ex rel. Oster v. Jorgenson*, decided two decades before *Asphalt Surfacing*, we observed that the effect of a general appropriation bill is exceedingly narrow:

> A general appropriation bill is not legislation in the true sense of the term. It is as its language implies "a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning[.]" . . . *It serves no other purpose* and its contents are constitutionally defined and limited.

81 S.D. 447, 450–51, 136 N.W.2d 870, 872 (1965) (emphasis added) (citation omitted).[8]

[¶37.]    This is not to say that general appropriation legislation authorizes absolutely nothing. These appropriation bills provide the necessary authority for the branches of state government, departments, and agencies to draw money from the state treasury. *See* SDCL 4-8-1 ("All expenditures . . . of moneys drawn from the state treasury shall be made under the authority of appropriation acts, which shall be based upon a budget as provided by law, and no money shall be drawn from the treasury, except by appropriation made by law pursuant to S.D. Const., Art. XII, § 2."); *see also* S.D. Const. art. XII, § 1 ("No money shall be paid out of the treasury except upon appropriation by law and on warrant drawn by the proper officer.").

---

8.    We have held that "while the Legislature is free to impose conditions and restrictions on appropriated funds within the body of a general appropriations bill, it may not substantively legislate in that bill in a manner that changes, amends or repeals existing law." *S.D. Educ. Ass'n v. Barnett*, 1998 S.D. 84, ¶ 19, 582 N.W.2d 386, 392. Indeed, general appropriation legislation that purports to substantively change an existing law may also run afoul of the single-subject requirement for legislation set out in Article III, § 21 of our Constitution. *See id.* ¶ 26, 582 N.W.2d at 393.

[¶38.]     But this is not the same type of authority referenced by the "contract authorized by any law" text in Article III, § 12, and the distinction lies not in the definition of the verb "authorized" but, rather, in the object of the verb. In other words, interpreting this part of the contract restriction is not about what "authorized" *means*—it is about *what* was authorized. General appropriation legislation authorizes nothing more than "setting apart . . . funds" and "serves no other purpose." *Oster*, 81 S.D. at 450–51, 136 N.W.2d at 872.

[¶39.]     For these reasons, the question for Article III, § 12's applicability is not, as the dissent suggests, whether a *state agency* had the authority to expend funds to fulfill a contract obligation and make it enforceable. Instead, applicability turns on whether *the Legislature* authorized a specific contract. This distinction tests the level of the Legislature's involvement with respect to a specific contract, not the authority of an agent of state government.

[¶40.]     By sharply restricting general appropriation legislation in Article XII, § 2, the framers of our Constitution manifested their clear intent to use general appropriation to fund the type of basic state government expenses that are "ordinary" and "current." *Oster's* definitions for these two terms seem predictable: "ordinary expenses" are "any related expense which recurs with regularity and certainty[,]" and "current expenses" mean "'running expenses' which includes any usual, regular, and continuing expenditure for the maintenance of property and for

conducting the regular and authorized functions of the institution." 81 S.D. at 456, 136 N.W.2d at 875.[9]

[¶41.]    Contrasted from these ordinary and current expenses are those which are considered extraordinary and not subject to general appropriation. *Id.* To some extent, our cases illuminate this distinction. For instance, in *Oster*, we held that current expenses do not include "[c]ost of land acquisitions, erection of permanent buildings and similar capital expenditures[.]" *Id.* "Extraordinary, emergent, and exceptional expenses for any purpose likewise fall within the category of 'All other appropriations'." *Id.* (quoting S.D. Const. art. XII, § 2); *see also State ex rel. Mills v. Wilder*, 73 S.D. 330, 340, 42 N.W.2d 891, 897 (1950) ("As a bill for an appropriation for highway expenditures, a two-thirds vote was essential to its passage." (citing S.D. Const. art. XII, § 2; S.D. Const. art. XIII, § 9)); *Duxbury v. Harding*, 490 N.W.2d 740, 746 (S.D. 1992) (holding that county tax relief, a new National Guard armory, and presidential primary election expenses were not "ordinary" expenses); *Apa v. Butler*, 2001 S.D. 147, ¶ 28, 638 N.W.2d 57, 68 (holding that certain

---

9.    The design of Article XII, § 2 reveals great perspicacity, as we observed in *Oster*:

> This constitutional provision allows a legislative majority to appropriate funds for the ordinary expenses of state government and denies to a minority the power to prevent, obstruct, or stop the operation of the vital affairs of government by denying those necessary funds. But the door to the state treasury is not so easily opened as to "all other appropriations". They must be the single subject of separate bills and receive the affirmative approval of two-thirds of all members of both houses of the legislature.

81 S.D. at 452, 136 N.W.2d at 873.

recurring expenses for the State Fair, Department of Social Services, Department of Agriculture, and Department of Health were correctly included in general appropriation legislation).[10]

[¶42.]        Despite this circumscribed and well-established view of general appropriation legislation, we applied *Asphalt Surfacing's* holding that general appropriation legislation constitutes authorization for specific State contracts in *Pitts v. Larson*, 2001 S.D. 151, 638 N.W.2d 254.  Relying upon *Asphalt Surfacing,* we held that a legislator's employment contract with South Dakota State University's Cooperative Extension Service was void because "[t]he 2001 General Appropriation Bill authorized payment for the employees of the SDSU CES."  *Id.* ¶ 15, 638 N.W.2d at 258.

[¶43.]        Chief Justice Gilbertson was unconvinced, however, and authored a dissenting opinion in which he expressed support for Presiding Judge Whiting's view in *Norbeck I* and cited the portion of *Oster* set out above.  *Id.* ¶¶ 25, 33, 638 N.W.2d at 260, 263 (Gilbertson, C.J., dissenting).  Joined by Justice Amundson, Chief Justice Gilbertson disputed the application of *Asphalt Surfacing's* contract-authorization-through-general-appropriation rule and noted that the decision to renew Pitts' employment contract annually rested solely with the Board of Regents and was not subject to legislative approval.  "The Legislature merely funded the

---

10.    In *Arndt v. Hannum Trucking*, 324 N.W.2d 680, 681 (S.D. 1982), we rejected the argument that a general appropriation bill authorized the Department of Transportation to purchase liability insurance and, thereby, waived sovereign immunity.

contract by its annual appropriations bill." *Id.* ¶ 33, 638 N.W.2d at 263 (Gilbertson, C.J., dissenting).

[¶44.] In our most recent consideration of Article III, § 12, we cited some of the broad statements from *Pitts* and *Asphalt Surfacing* and determined that legislators could not enter into contracts incidental to a grant program designed to spend unused federal money allocated to South Dakota as part of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). *See Noem*, 2020 S.D. 58, ¶ 14, 950 N.W.2d at 682. However, the circumstances we confronted in *Noem* were much different than those presented in either *Asphalt Surfacing* or *Pitts*.

[¶45.] During an October 2020 special session called by the Governor, the Legislature amended the general appropriation law to account for the CARES Act money, but significantly, the Legislature also passed a separate Senate concurrent resolution, titled "Directing expenditure of certain federal coronavirus relief funds[,]" that authorized and established a grant program for unspent and unobligated funds to be administered by the Governor.[11] *Id.* ¶ 3, 950 N.W.2d at 680.

[¶46.] The resolution established the amounts of the grants available and the criteria for eligibility. The Legislature stated "that this resolution reflects the intent of the Legislature based upon the current economic climate and the federal

---

11. In her Executive Proclamation, dated October 2, 2022, the Governor stated that the special legislative session was necessary to "amend the Fiscal Year 2021 budget for the planned expenditure of federal funds relating to coronavirus relief received by the state, and to *consider the resolution recommended by the Interim Committee on Appropriations on September 30, 2020.*" (Emphasis added.)

laws and guidance relating to expenditure of relief funds and it is the intent of the Legislature that the Governor may exercise her authority to adjust to changing economic conditions . . . provided that the Governor inform and seek the input of the special interim committee[.]" In her October 2020 request for an advisory opinion, the Governor indicated an intent to implement the Senate concurrent resolution. Under the circumstances, our decision in *Noem* correctly prohibited legislators from participating in contracts relating to the grants the Legislature had authorized.

[¶47.] In sum, the current state of our decisional law reflects an expansive view of the contract restriction contained in Article III, § 12 based on our holding in *Asphalt Surfacing* that equates general appropriation with the authority to enter into specific contracts. But this rule stands in perceptible tension with what we conclude is the sounder, established rule expressed in Article XII, § 2 and *Oster*, both of which make clear that general appropriation legislation is not so potent.

### *The fate of Asphalt Surfacing and Pitts*

[¶48.] The doctrine of stare decisis exists as a prudential means of promoting stability in the law by adhering to the holdings in our prior decisions and regarding them as precedential. "Ordinarily, under [these] principles . . ., we would follow our own precedent." *Sentell v. Farm Mut. Ins. Co. of Lincoln Cnty.*, 2021 S.D. 19, ¶ 28, 956 N.W.2d 826, 835. However, when we are convinced that a decision was wrongly decided, we remain free to correct it. *Id.* In these instances, stare decisis becomes less efficacious:

> The strong respect for precedent which is ingrained in our legal system is a reasonable respect which balks at the perpetuation of error, and it is the manifest policy of our courts to hold the doctrine of stare decisis subordinate to legal reason and justice,

> and to depart therefrom when such departure is necessary to avoid the perpetuation of pernicious error.

*Brekke v. Crew*, 43 S.D. 106, 178 N.W. 146, 154 (1920) (citation omitted).  Still, "we should approach the question of whether to depart from precedent with great caution and restraint."  *Luze v. New FB Co.*, 2020 S.D. 70, ¶ 48, 952 N.W.2d 264, 276–77 (Salter, J., dissenting in part and concurring in result in part).

[¶49.]     The United States Supreme Court has expressed the same view, declaring that stare decisis "is not an inexorable command."  *Pearson v. Callahan*, 555 U.S. 223, 233, 129 S. Ct. 808, 816, 172 L. Ed. 2d 565 (2009) (citation omitted).  The Supreme Court has also recognized that the doctrine of "stare decisis . . . is at its weakest when we interpret the Constitution[.]"  *Agostini v. Felton*, 521 U.S. 203, 235, 117 S. Ct. 1997, 2016, 138 L. Ed. 2d 391 (1997).  And despite the virtues of settled expectations fostered by adhering to precedent, the Supreme Court has observed that perpetuating an incorrect decision concerning the Constitution is different than an erroneous decision interpreting a statute, which can be changed or amended legislatively.  *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455–56, 135 S. Ct. 2401, 2409, 192 L. Ed. 2d 463 (2015).

[¶50.]     The Supreme Court has identified five factors to weigh when considering whether to overrule flawed precedent: (1) the quality of its prior decision's reasoning; (2) the workability of the prior rule established by its precedent; (3) the consistency of the prior decision with other related decisions; (4) subsequent developments since the erroneous decision; and (5) the extent of the reliance on the earlier decision.  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. ___, 138 S. Ct. 2448, 2478–79, 201 L. Ed. 2d 924 (2018).  We

find these factors helpful in determining whether to overrule *Asphalt Surfacing* and *Pitts.*

[¶51.] First, the quality of our reasoning in *Asphalt Surfacing* was not particularly satisfying. In its brief, the Legislature correctly describes the decision as an ipse dixit—i.e., the only basis offered for our holding that a general appropriation bill authorizes specific State contracts is the plain fact that we said it did. We did not undertake a careful review of Article III, § 12's text, as Presiding Judge Whiting had done in his *Norbeck I* concurrence, which we later implemented in *Norbeck II.*

[¶52.] Next, our decision in *Asphalt Surfacing* is acutely unworkable. By connecting authority to contract with general appropriation, we have painted legislators into a corner in which *any connection* with money derived from a general appropriation bill potentially violates the Constitution.[12] Operating with this inaccurate view of general appropriation legislation, members of the Legislature seeking to comply with Article III, § 12 believe they are relegated to assessing the degree of an indirect interest in a State contract funded by the general appropriation bill.

[¶53.] But this is fraught with peril because there is no textual support for the view that the "indirectness" of a legislator's interest in a State contract can be parsed in this way. The text of Article III, § 12 flatly prohibits contracts in which a

---

12. In *Asphalt Surfacing*, we cited with approval some of the dicta from *Palmer* set out above that appeared to state that Article III, § 12 prohibited "any pecuniary benefit from legislation enacted by the legislature"—a much broader-sounding ban than simply a restriction on particular contracts. *See* 385 N.W.2d at 117 (quoting *Palmer*, 11 S.D. at 80–81, 75 N.W. at 819).

legislator is "interested, directly or indirectly[.]" Under a plain reading, the phrase "directly or indirectly" is not used to measure the extent of a legislator's interest but to emphasize that *no* interest is allowed.[13]

[¶54.] Detaching authorization from general appropriation, on the other hand, creates a workable rule under which legislators, and any other interested party, can know with much greater certainty whether a contract is prohibited or not. If a contract was authorized in a special appropriation bill or other legislation passed during a legislator's term, it is prohibited by Article III, § 12 for the length of the legislator's term and one additional year.[14]

[¶55.] Third, overruling *Asphalt Surfacing* and *Pitts* will not disrupt the overall state of our law; it will reconcile it. As the Legislature's counsel correctly acknowledged at oral argument, *Asphalt Surfacing* and Article XII, § 2 cannot coexist.[15]

---

13. For the reasons explained above when declining to answer the nine specific questions posed by the Governor, we likewise decline to define the term "interested" to describe a point beyond any discernible consequence that falls outside of Article III, § 12. Any such effort is ill-suited for an advisory opinion proceeding, which necessarily lacks the benefit of comprehensive fact finding. We express no opinion as to whether the Legislature could seek to define "interested."

14. The dissent's proposed subjective test would leave the state of our law a little worse for the wear by creating more questions regarding Article III, § 12 compliance than answers.

15. The Attorney General suggests a holding that general appropriation legislation does not authorize specific contracts would mark us as an "outlier" among the handful of states that have constitutional provisions similar to Article III, § 12. But this argument does not adequately account for the existing constitutional restrictions on general appropriation legislation that consign it to simply setting money aside to fund state government and "*no*

(continued . . .)

[¶56.]    To understand how *Asphalt Surfacing's* interpretation of Article III, § 12 was wrong from the beginning, we need to look no further than Article XII, § 2, which, by its text and our interpretation of it, sharply restricts the purpose and effect of general appropriation legislation.  Indeed, our decision in *Oster* explaining that general appropriation legislation "is not legislation in the true sense of the term" because "its contents are constitutionally defined and limited[,]" had been settled law in South Dakota for twenty-plus years before our decision in *Asphalt Surfacing*.  81 S.D. at 451–52, 136 N.W.2d at 872.  And though, in fairness, it does not appear that the impact of Article XII, § 2 was presented by the parties in *Asphalt Surfacing*, we were unquestionably aware of *Oster* and Article XII, § 2 when we decided *Pitts*—Chief Justice Gilbertson cited both in his dissent.

[¶57.]    Fourth, we are not aware of subsequent developments since *Asphalt Surfacing* that would justify the view that it is sometimes "more important that the applicable rule of law be settled than that it be settled right."  *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S. Ct. 443, 447, 76 L. Ed. 815 (1932) (Brandies, J., dissenting), *overruled by Helvering v. Mountain Producers Corp.*, 303 U.S. 376, 58 S. Ct. 623, 82 L. Ed. 907 (1938).  To the contrary, the *Asphalt Surfacing* rule, in addition to its unstable footings, has proven to be an impractical and, therefore,

---

(. . . continued)

    *other purpose*[.]"  *Oster*, 81 S.D. at 450–51, 136 N.W.2d at 872 (emphasis added).  In addition, we do not believe that we are alone in our view of the limits upon general appropriation legislation.  *See State ex rel. Stratton v. Roswell Indep. Sch.*, 806 P.2d 1085, 1096 (N.M. Ct. App. 1991) (concluding that general appropriation legislation did not authorize contracts of public school employees who were legislators (citing *State ex rel. Baca v. Otero*, 267 P. 68 (N.M. 1928)).

inaccurate measure of Article III, § 12 compliance. The decision changed a restriction on contracts authorized during a legislator's term to a de facto bar on any connection with State funding.[16]

[¶58.] Finally, though there is evidence of reliance in the form of our *Pitts* decision, there is a greater sense that the rule of *Asphalt Surfacing* has given rise to increasing uncertainty. We understand that legislators want to meet their obligations under the Constitution, but the lack of clarity prevents that predictable or concrete reliance.

[¶59.] Under the circumstances, we conclude that it is best to correct the error of *Asphalt Surfacing*, repeated in *Pitts*, by overruling these decisions in order to bring our Article III, § 12 jurisprudence into congruence with existing, settled constitutional and decisional authority concerning the nature and scope of general appropriation legislation.

---

16. Despite the Mississippi Supreme Court's view that general appropriation legislation authorizes specific state contracts under a constitutional provision similar to Article III, § 12, it does not appear that the resulting rule consistently prohibits contracts in which Mississippi legislators are interested. *See Frazier v. State ex rel. Pittman*, 504 So. 2d 675 (Miss. 1987). Rather, it appears the court has used an ad hoc approach that the court acknowledges elevates policy and purpose over text. *See id.* at 695 (holding the court will "interpret [the constitutional contract restriction] in accordance with the plain meaning of its words *so long as* it bears some rational relationship to this purpose" (emphasis added)). In *Frazier*, for instance, the court held that employment contracts with schoolteachers who served as legislators were void because they were funded by a general appropriation bill. However, the court also held that another legislator did *not* have a prohibited interest in his wife's teaching contract because it "simply defies practical wisdom to carry this section to such an extreme." *Id.* at 698. Similarly, in *Jones v. Howell*, the court held that the Medicaid contracts of two legislators who were also pharmacists were not prohibited after accepting their argument "that there is no danger of self-dealing[.]" 827 So. 2d 691, 699–700 (Miss. 2002).

### *History and the framers' anti-corruption intent*

[¶60.] We have, at times, engaged in a "historical analysis in the proper interpretation of the South Dakota Constitution." Jon Lauck, "The Organic Law of a Great Commonwealth": The Framing of the South Dakota Constitution, 53 S.D. L. Rev. 203, 204 (2008) (collecting cases in footnote 6). However, the briefs submitted by the interested parties do not rely upon historical facts to further an original intent argument relating to the text of Article III, § 12—perhaps due to the paucity of information relating to the specific language of the contract restriction.[17]

[¶61.] What is clear from the period of our constitutional formation was a strong desire for good government free of corrupt elected officials:

> When they met in their constitutional conventions during the 1880s, the delegates expended their greatest energy trying to eliminate corruption in the future state government. Weary of carpetbag territorial appointees and their collaboration with railroad interests, the delegates pushed for stringent limitations on outside influences on the legislature. In keeping with the long-time republican obsession with eliminating political corruption, they succeeded in incorporating several anti-corruption elements into the fundamental law of the territory.

Lauck, *supra* ¶ 60, at 221.

[¶62.] Though Article III, § 12 may fairly be regarded as one of these anti-corruption measures, as our cases note as early as *Palmer*, we have no indication that the framers' intent extended beyond the plain text they used to draft § 12. Perhaps more to the point, there is no historical indication that the framers would

---

17. In support of its textual argument, the Legislature's brief does cite several definitions of "authorize" and "authority" taken from dictionaries published in the nineteenth and early-twentieth centuries. However, these definitions do not differ fundamentally from more contemporary definitions.

have considered the current general-appropriation-equals-authorization rule as a necessary means to thwart corruption. Indeed, it appears the framers accounted for the potential that a would-be unscrupulous legislator could abuse general appropriation legislation by including Article XII, § 2 and limiting general appropriation bills, as discussed above, to generally funding State government, not extraordinary expenses.[18]

## Conclusion

[¶63.] This case presents an appropriate instance to exercise our advisory opinion jurisdiction under Article V, § 5. The current state of our decisional law concerning Article III, § 12 is not sustainable. Our holdings in *Asphalt Surfacing* and *Pitts*, which equated general appropriation for ordinary and current expenses with legislative authorization to enter into specific contracts, are contrary to well-established constitutional limits on general appropriation legislation set out in

---

18. Though not central to our interpretation of constitutional text, we are unable to accept Representative Hansen's suggestion that overruling *Asphalt Surfacing* would eliminate an important constitutional conflict of interest restriction. The restriction of Article III, § 12 remains, only now in a more textually sound and workable form. For example, a plumbing company owned by a legislator cannot serve as a subcontractor for the construction of a new prison if the project was authorized during the legislator's term by special appropriation legislation. Under *Oster*, this type of capital expense would be viewed as extraordinary and ineligible for funding under general appropriation legislation, fitting squarely within the heartland of Article III, § 12's preemptive anti-corruption intent—i.e., legislators benefiting from specific appropriation bills passed during their term. However, the legislator's plumbing company could be engaged to repair a water leak at a state building without violating Article III, § 12, where that expense was viewed as an ordinary or current expense and appropriately sourced to a general appropriation bill, not to specific authority from the Legislature to fix the water leak.

Article XII, § 2 and our cases. These holdings expressed in *Asphalt Surfacing* and *Pitts* are, therefore, overruled.

[¶64.]     Our answer to the Governor's restated question whether Article III, § 12 prohibits all contracts between legislators and the State is: No, it does not. The contract restriction stated in Article III, § 12 is not a categorical bar on all contracts funded by the State. Instead, it prohibits a legislator, or former legislator within one year following the expiration of the legislator's term, from being interested, directly or indirectly, in contracts that are authorized by laws passed during the legislator's term. The purpose and effect of general appropriation legislation is restricted to simply allocating money to fund state government; it does not, itself, authorize specific contracts relating to ordinary or current expenses.

[¶65.]     JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, concur.

[¶66.]     KERN, Justice, dissents.


KERN, Justice (concurring in part and dissenting in part).

[¶67.]     I respectfully dissent from the portion of the majority opinion which overrules decades of established precedent to exempt general appropriations from Article III, § 12 of the South Dakota Constitution. This approach disregards the constitutional text and may ultimately prove difficult to interpret as the majority opinion adopts a capacious understanding of interest, prohibiting legislators from having *any* interest whatsoever—no matter how indirect or attenuated—in contracts authorized by special appropriations. Nevertheless, I join the majority opinion's important holding that Article III, § 12 applies to "law[s] passed *during*

*the legislator's term. . .* not merely. . . laws for which the legislator cast a vote."

(Emphasis added.) Additionally, although I agree that the circumstances surrounding the Governor's request indeed constitute a solemn occasion under Article V, § 5, which permits this Court to exercise our original jurisdiction, I question whether the submitted interrogatories present "important questions of law involved in the exercise of [her] executive power." Rather, they seem more akin to questions from legislators regarding their individual concerns, which is not properly within the purview of an advisory opinion. *See* S.D. Const. art. V, § 5.

[¶68.]    The Governor argues that further interpretation of Article III, § 12 is necessary to inform the exercise of her legislative appointment power and the administration of State funds. However, this constitutional provision does not limit the Governor's discretion in legislative appointments.[19] Indeed, the relevant portion of § 12 is only implicated after an individual enters office and it is then the responsibility of the legislator to forgo improper interests in any contract authorized by a law passed during his or her term. The Attorney General is also available to advise State agencies based on our existing precedent concerning conflicts of interest in governmental contracting. Thus, the Governor's request does not truly implicate the exercise of her executive power. The Governor can appoint a qualified candidate of her choice, and the candidate is free to accept or reject the

---

19.    In contrast, Article V, § 2, referenced in the majority opinion, requires the Governor to select members of the Supreme Court "from compact districts," making the definition of a compact district a necessary predicate essential to making the appointment. *See In re Daugaard*, 2011 S.D. 44, ¶ 7, 801 N.W.2d 438, 440.

appointment. For these reasons, I would find that our jurisdiction to consider this matter stems solely from the solemn occasion clause of Article V, § 5.

## *The Interpretation of Article III, § 12*

[¶69.] Article III, § 12 of the South Dakota Constitution provides that:

> [N]or shall any member of the Legislature during the term for which he shall have been elected, or within one year thereafter, be interested, directly or indirectly, in any contract with the state or any county thereof, authorized by any law passed during the term for which he shall have been elected.

As noted by the majority opinion, cases such as *Palmer*, *Norbeck I*, and *Norbeck II* consistently "focused [this] prohibition at the point of legislative authorization." *See Palmer v. State*, 11 S.D. 78, 75 N.W. 818 (1898); *Norbeck & Nicholson Co. v. State* (*Norbeck I*), 32 S.D. 189, 142 N.W. 847 (1913); and *Norbeck & Nickolson Co. v. State* (*Norbeck II*), 33 S.D. 21, 144 N.W. 658 (1913). In other words, our analysis centered on whether the contract in question had been "authorized" by a law passed during the legislator's term.

[¶70.] According to the majority opinion, *Asphalt Surfacing Co. v. South Dakota Department of Transportation*, 385 N.W.2d 115 (S.D. 1986), goes beyond this line of precedent and the text of Article III, § 12 because it applies the contractual interest prohibition to general appropriations, whereas, in the majority opinion's view, *Palmer*, *Norbeck I*, and *Norbeck II* involved legislation that "specifically authorized the contracts at issue." In order to avoid *Asphalt Surfacing's* conclusion that the phrase "any law" in Article III, § 12 must necessarily encompass all laws, including general appropriations, the majority opinion appeals to the "exceedingly narrow" definition of general appropriations set forth in *State ex rel. Oster v.*

*Jorgenson*, 81 S.D. 447, 450–51, 136 N.W.2d 870, 872 (1965) (interpreting S.D. Const. art. XII, § 2).

[¶71.]    But *Oster* is not dispositive, or even relevant, to the textual meaning of Article III, § 12.  Whether general appropriation is understood narrowly or broadly, the essential question remains: When does a law "authorize" a government contract?  To answer this question, we must begin with the constitutional text.  *See Brendtro v. Nelson*, 2006 S.D. 71, ¶ 16, 720 N.W.2d 670, 675.  In the words of Justice Story: "If the text be clear and distinct, no restriction upon its plain and obvious import ought to be admitted, unless the inference be irresistible."  *Martin v. Hunter's Lessee*, 14 U.S. 304, 338–39, 4 L. Ed. 97 (1816).  Although excising general appropriations from the coverage of Article III, § 12 may reduce the burdens of legislative compliance and assuage other policy concerns, our role is not to say what the Constitution *should mean* to accomplish these goals but what it, in fact, does mean.

[¶72.]    In order to honor this responsibility in the context of the Governor's request, our analysis should focus on the original public meaning of Article III, § 12, concerning two related questions:

1.    When and how are government contracts authorized by law?

2.    What is meant by a direct or indirect interest?

## *Contract Authorization*

[¶73.]    "When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted."

*McDonald v. City of Chicago*, 561 U.S. 742, 828, 130 S. Ct. 3020, 3072, 177 L. Ed. 2d 894 (2010) (Thomas, J., concurring in part).  This stems from the fundamental principle that a constitution is enacted by the will and authority of the people and, therefore, its meaning, as understood by the people at the time of ratification, is the supreme law of the land.  As we have stated previously, original meaning can be discerned from "[t]he 'historical context' of a constitutional provision"—including constitutional debates and case law.  *Doe v. Nelson*, 2004 S.D. 62, ¶ 10, 680 N.W.2d 302, 306.

[¶74.]	*Palmer*—decided only a few years after ratification of the South Dakota Constitution—serves as highly persuasive evidence concerning the original public meaning of Article III, § 12.  In *Palmer*, this Court held that a legislator could not receive payment for legal services rendered to a railroad commission because the contract for legal services had been "authorized by *laws* passed during the term of the legislature for which plaintiff was elected."  11 S.D. 78, 75 N.W. at 819 (emphasis added).  The two authorizing "laws" included a general appropriation, which provided $4,500 for a "litigation fund" over a two-year period, and a statute, authorizing the railroad commission "to employ any and all additional legal counsel to assist them in the discharge of their duties."  *Id.*  Nevertheless, *Palmer* refers to both pieces of legislation as having "authorized" the legal contract.[20]  *Palmer* thus strongly suggests that, at the time of ratification, it

---

20.	Apart from plainly referring to both "laws," *Palmer* makes clear that its holding applies to general appropriation by rendering invalid "[a]ll contracts between the state and members of the legislature during the prohibited period."  11 S.D. 78, 75 N.W.2d at 819.  Such a broad prohibition would be

(continued . . .)

was widely understood that general appropriations did in fact "authorize" contracts and were subject to Article III, § 12. Indeed, *Palmer* illustrates the fundamental point—rejected by the majority opinion—that both the legal authority to contract on behalf of the State and the authority to spend State funds are necessary ingredients of Legislative authorization to contract.[21]

[¶75.] The majority opinion disregards this persuasive evidence of original meaning and intent, accusing *Palmer* of making "broad statements of policy [that] were too ambitious to be supported by the text of Article III, § 12." But such supposed statements are irrelevant to *Palmer's* central holding that general appropriations authorize the contracts that they fund. As a result, the majority opinion's attempt to present *Pitts* and *Asphalt Surfacing* as a departure from the "well-established view of general appropriation" expressed in *Oster* is unavailing. To the contrary, *Palmer*, *Asphalt Surfacing*, and *Pitts* represent an unbroken chain

---

(. . . continued)

  unnecessary unless general appropriations—funding the vast majority of government contracts—were covered by Article III, § 12.

21. *Palmer* also provides an important contemporary exposition of the purpose and intent behind Article III, § 12:

  The language of the constitution is plain. Its meaning cannot be mistaken. The purpose of the provision is apparent. It is intended to preclude the possibility of any member deriving, directly or indirectly, any pecuniary benefit from legislation enacted by the legislature of which he is a member. It is one of the most important of the many reforms attempted by the framers of our organic law. It is intended to remove any suspicion which might otherwise attach to the motives of members who advocate the creation of new offices or the expenditure of public funds.

  *Id.*

of precedent holding that general appropriations—regardless of how narrowly defined—authorize government agencies to spend money. In other words, to contract.[22] Today, the majority opinion departs from this consistent jurisprudence, uprooting over a century of legal doctrine.[23]

[¶76.] "[T]o overrule an important precedent is serious business" and should not be undertaken lightly. *Ramos v. Louisiana*, 590 U.S. ___, ___, 140 S. Ct. 1390, 1413, 206 L. Ed. 2d 583 (2020) (Kavanaugh, J., concurring in part). Just over three years ago, this Court unanimously stated that the prohibitions of Article III, § 12 "are broad in scope and extend to any contract between a legislator and the State, including the General Appropriations Bill." *In re Noem*, 2020 S.D. 58, ¶ 13, 950 N.W.2d 678, 682. The majority opinion abruptly changes course without providing any justification as to what legal or societal developments in the last three years may have prompted such a substantial rejection of our precedent. Especially where, as here, a legal rule is based upon decades of reliable jurisprudence, a departure

---

22. The majority opinion suggests that the *Norbeck* opinions turned on "special legislation that specifically authorized the contracts at issue." However, these opinions in no way state or imply that general appropriations were exempt from Article III, § 12. The only legislation at issue in these opinions was a special appropriation for an artesian well on state university grounds. The opinions—including Justice Whiting's concurrence in *Norbeck I*—were confined to these facts and did not address the matter of general appropriations. *See Norbeck I*, 32 S.D. 189, 142 N.W. 847; *see also Norbeck II*, 33 S.D. 21, 144 N.W. 658.

23. Reliance interests alone strongly counsel against the majority opinion's departure from stare decisis as the Attorney General has developed robust advice for the Legislature based on our long-established precedents. *See Opinion re J.E. Brinkman*, 1977 S.D. Op. Atty. Gen. 145; *Opinion re Alice Kundert*, 1982 S.D. Op. Atty. Gen. No. 171; *Opinion in re Tim Johnson*, 1984 S.D. Op. Atty. Gen. 170; *Opinion re Terry C. Anderson*, 1990 S.D. Op. Atty. Gen. 291; *Opinion re Jeffrey R. Vonk*, 2008 S.D. Op. Atty. Gen. No. 08-03.

from existing precedent requires "special justification," which has not been articulated by the majority opinion. *Ramos*, 590 U.S. at ___, 140 S. Ct. at 1413. But far from being "egregiously wrong," *see id.*, *Asphalt Surfacing* and *Pitts* are firmly grounded in the text of Article III, § 12.

[¶77.] Turning to the text, the Legislature's brief helpfully provides several historical definitions of "authorize."[24] One, in particular, is of interest. In the 1880 Webster's Dictionary, the first definition of "authorize" is: "To clothe with authority; warrant, or legal power; to give a right to act; to empower; as, to *authorize* commissioners to settle a boundary." N. Webster, *American Dictionary of the English Language* (1880). Now "authorize" in Article III, § 12 is used in the specific context of authorization to contract. So, the question becomes, does a general appropriation give public officials the "right" or "legal power" to expend funds through contracts?

[¶78.] A legislative appropriation, in its most simple terms, is an authorization to spend money. The First Edition of *Anderson's Law Dictionary*, published the very year of the ratification of the South Dakota Constitution, defines the "appropriation of public money" as "an authority from the legislature, given at

---

24. The Legislature's brief, under the purported auspices of textualism, suggests a most narrow conception of contract authorization. The Legislature argues that "[t]he framers clearly understood the concept of funding and appropriations as a distinct and unique part of the legislative process." Thus, in its view, "authorized by any law" refers exclusively to "a specific law. . . that provided the legal authority, not simply a revenue source, for the contract in which the legislator is interested." As support for this interpretation, the Legislature focuses exclusively on the historical meaning of one word: "authorize." According to the Legislature, the numerous historical definitions cited in its brief demonstrate that "authorize" and "fund" have meanings that are "entirely separate."

the proper time and in legal form, to the proper officers, to apply sums of money out of that which may be in the treasury in a given year to specified objects or demands against the State." *Appropriate*, Anderson's Law Dictionary (1st ed. 1889). The First Edition of *Black's Law Dictionary* defines "appropriation" as "the act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue . . . to be applied to some general object of governmental expenditure." *Appropriation*, Black's Law Dictionary (1st ed. 1891).

[¶79.]        In other words, a general appropriation gives public officials "authority" to "apply sums of money" to "some general object of governmental expenditure." This definitional understanding is supported by our Court's consistent statements that appropriations, whether general or special, "authorize" expenditures. In *Brown v. State*, an acting commissioner of insurance had purchased office supplies that were delivered after his replacement was appointed. 14 S.D. 219, 84 N.W. 801 (1901). This Court noted that, when the supplies were ordered, the general appropriation bill of 1899 had "expressly authorized" the commissioner "to expend $1,000 during the fiscal year" on miscellaneous expenses. *Id.* As a result, the contract for office supplies was enforceable. Similarly, in *State ex rel. Mills v. Wilder*, we held that "a measure *authorizing* the expenditure of money by the state on the highways" was an appropriation and thus subject to the two-thirds requirement of Article XIII, § 9. 73 S.D. 330, 335, 42 N.W.2d 891, 894 (1950) (emphasis added).

[¶80.]        Thus, there is strong evidence that appropriations do in fact "authorize" the expenditure of funds through contracts under the original public

meaning of Article III, § 12. Indeed, by the majority opinion's own admission, "appropriation bills provide the necessary authority for the branches of state government, departments, and agencies to draw money from the state treasury." Nevertheless, the majority opinion attempts to avoid the inevitable conclusion of such an admission by drawing an illusory distinction between authorization to contract and authorization to draw and spend money from the treasury. According to the majority opinion, the central interpretative question "is not about what 'authorized' means—it is about *what* was authorized." But authorization to spend is, by definition, authorization to contract.

[¶81.] Whenever a government department draws and spends money from the treasury, it is necessarily entering into and fulfilling contractual obligations. Indeed, without the authorization of a general appropriation, a government department cannot spend money and, thus, does not have authority to contract. *See* S.D. Const. art. XII, § 1. The majority opinion admits that its attempted "distinction tests the level of the Legislature's involvement with respect to a specific contract." Said differently, in the majority opinion's view, although general appropriations do "authorize" spending, the resulting contracts are just too remote to fall under Article III, § 12. Thus, the majority opinion hinges not on the meaning of "authorized by any law," but on whether Legislative authorization is attenuated enough from a contractual interest. But this is the exact type of analysis the majority opinion disclaims in the context of direct and indirect interests.

[¶82.] The majority opinion also disregards the decisions of other state courts involving state constitutional provisions almost identical to Article III, § 12. In

*Cassibry v. State*, the Mississippi Supreme Court determined that general appropriations authorized the employment contract of a state legislator. 404 So. 2d 1360 (Miss. 1981). The *Cassibry* court reasoned that it was "necessary for an appropriation bill to be passed authorizing the expenditure of money before the Department had authority to obligate the state to make payment of money." *Id.* at 1366. Thus, the legislator had impermissibly participated in the "authorization" of his employment contract by voting for the general appropriation bills. The Supreme Court of Oklahoma has also determined that public teacher contracts are authorized by general appropriations and thus void as to legislators under a constitutional provision equivalent to Article III, § 12. *State ex rel. Settles v. Bd. of Ed. of Dependent Sch. Dist. No. D-38*, 389 P.2d 356 (Okla. 1964).[25]

[¶83.] Whether a contract is authorized by a particular law should be a straightforward analysis. If the contractual interest depends on passage of the law, then the law necessarily authorizes that contract. This test comports with our long-standing precedents and a proper contextual understanding of Article III, § 12. In *Palmer*, two "laws" were at issue: 1) an enabling statute establishing the railroad

---

25. Both federal and state courts have recognized, as a matter of course, that appropriation bills do indeed "authorize" spending. *See United States Dept. of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (determining "whether, and under what circumstances, a general appropriation for an agency's operations implicitly authorizes the purchase of bottled water"); *Forty-Seventh Legislature of State v. Napolitano*, 143 P.3d 1023, 1028 (Ariz. 2006) (defining "appropriation" as "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other"); *State ex rel. Stephan v. Carlin*, 631 P.2d 668, 673 (Kan. 1981) (describing "appropriation bills" as "the setting apart of state funds and the authorization of the expenditure thereof for specific purposes").

commission, which was given the authority to contract for legal services; and 2) a general appropriation, which authorized $4,500 for the railroad commission "litigation fund." 11 S.D. 78, 75 N.W.2d at 819 (citing 1897 S.D. Sess. Laws ch. 110 § 41; 1897 S.D. Sess. Laws ch. 10 § 20). The majority opinion concludes that only the first law authorized the legislator's contract for legal services. Thus, according to the majority opinion, the railroad commission needed no further authorization in order to enter into the contract with the legislator.

[¶84.] However, the *Palmer* Court specifically referred to "laws," stating that the contract was authorized by both "laws passed during the term of the legislature for which [the legislator] was elected." 11 S.D. 78, 75 N.W. at 819. And rightly so, because the railroad commission could not have entered into the contract for legal services in the absence of either law. The majority opinion seems to suggest that this contract would have been fully "authorized" absent the general appropriation for a litigation fund. In other words, the railroad commission—lacking any appropriated funds to do so—could have obligated the State to pay for legal services. But such a scenario would be a blatant violation of South Dakota Constitution Article XII, § 1.

[¶85.] Rather, *Palmer* demonstrates that when a law is a but-for cause of a government agency's authority to enter into a contract, the law necessarily authorizes that contract. For example, in *Asphalt Surfacing*, there would have been no funding for the DOT road improvement contracts absent the general appropriation. 385 N.W.2d. at 116. Likewise, in *Pitts*, the SDSU employee's contractual salary would not have been paid but for passage of the annual general

appropriation. 2001 S.D. 151, ¶ 15, 638 N.W.2d at 258. Thus, both cases correctly held that general appropriations "authorize" the contracts they fund.

[¶86.] If a legislator knows that a potentially lucrative contractual interest hinges on the passage of particular legislation, then the legislator's impartiality may reasonably be called into question. In such situations, the legislator may very well have interests contrary to those of the general public. This undermines the very purpose of Article III, §12, which was "intended to remove any suspicion which might otherwise attach to the motives of members who advocate the creation of new offices or the expenditure of public funds." *Palmer*, 11 S.D. 78, 75 N.W. at 819.

[¶87.] The prohibition of Article III, § 12 extends to "any contract" that is authorized by "any law" during a legislator's term without exception. Indeed, the very existence of Article XII, § 2—providing for general appropriations bills—cuts against the majority opinion because the framers could have, *but did not*, exempt this form of legislation from the coverage of Article III, § 12. There is no proviso or indication that "any law" applies only to special appropriations or that "any contract" does not include those authorized by a general appropriation. Nevertheless, the majority opinion reads an exception into the text where there simply is none.

[¶88.] In so doing, the majority opinion abruptly overturns not only *Asphalt Surfacing* and *Pitts*, but also our historical understanding, dating from *Palmer* in 1898, that an appropriation—whether general or specific—authorizes the government to expend funds and, thus, to contract. This runs contrary to the Legislature's own conception of appropriation acts: "All expenditures of the state

and of its budget units of moneys drawn from the state treasury shall be made *under the authority* of appropriation acts." SDCL 4-8-1 (emphasis added). Here again, we find evidence of a previously well-established understanding that government contracts spend money "under the authority" of appropriation acts.

[¶89.] Although the majority opinion categorically exempts general appropriations from Article III, § 12, its interpretation may result in more uncertainty than it resolves. Instead of adopting an alternative definition of "authorized by any law," the majority opinion merely holds that the appropriation of funds, and thus a general appropriations bill, does not authorize an individual contract. This leaves a hole in our precedent regarding what criteria are necessary for a contract to be "authorized by law" for purposes of Article III, § 12. As queried by counsel for the Legislature at oral argument, does "authorization" only occur when legislation specifically gives a government agency the legal authority to contract for a particular purpose? If so, then certain special appropriation bills that allocate additional funds to a pre-existing project may also be exempt. *See* 2023 S.D. Sess. Laws H.B. 1030. If not, then why should the appropriation of funds through special appropriation bills constitute "authorization" but not the appropriation of funds through a general appropriation?

[¶90.] The majority opinion also adopts a strict interpretation of "interested, directly or indirectly" in the context of Article III, § 12. According to the majority opinion, "'directly or indirectly' is not used to measure the extent of a legislator's interest but to emphasize that *no* interest is allowed." But does not every citizen, to a greater or lesser degree, have at least *some* interest in special appropriations

passed by the Legislature?  Undoubtedly, the crux of the problem centers on determining what constitutes a direct or indirect interest under Article III, § 12. But the majority opinion declines to interpret the term interested and expresses no opinion regarding whether the Legislature could define the term, perhaps because the question likely strays into one of constitutional interpretation.[26]

### *The Meaning of "Interested"*

[¶91.]      Article III, § 12 prohibits legislators from becoming "interested, directly or indirectly."  At the dawn of the 20th Century, "interested" was defined as "1) Affected; moved 2) Having an individual interest or concern; biased 3) Done through or for personal interest."  *Interested*, Webster's New Standard American Dictionary (Laird & Lee ed. 1912).  The meaning of the term was thus centered on the effects of the interest.  In other words, an individual would be "interested" if he or she was "affected by" or "biased" as a result of some personal interest.  In the context of Due Process, we have adopted a similar understanding: "If the circumstances show a likely capacity to tempt the official to depart from his duty, then the risk of actual bias is unacceptable and the conflict of interest is sufficient to disqualify the official."  *Hanig v. City of Winner*, 2005 S.D. 10, ¶ 15, 692 N.W.2d 202, 207.  The Attorney General's brief also suggests a comparable definition: "[A]ny situation where a legislator's 'personal interest will conflict with the faithful performance of his duties.'"  *See Opinion re Thomas C. Todd*, 1977 S.D. Op. Atty. Gen. 202.

---

26.     Especially in matters of constitutional interpretation, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803).

[¶92.]    In *Hanig*, "as guidance to South Dakota officials and courts," this Court referenced four different types of interests:

> (1)    "Direct pecuniary interests," when an official votes on a matter benefiting the official's own property or affording direct financial gain;

> (2)    "Indirect pecuniary interests," when an official votes on a matter that financially benefits one closely tied to the official, such as an employer, or family member;

> (3)    "Direct personal interest," when an official votes on a matter that benefits a blood relative or close friend in a non-financial way, but a matter of great importance, as in the case of a councilman's mother being in the nursing home subject to the zoning issues; and

> (4)    "Indirect [p]ersonal [i]nterest" when an official votes on a matter in which an individual's judgment may be affected because of membership in some organization and a desire to help that organization further its policies.

2005 S.D. 10, ¶ 19, 692 N.W.2d at 208–09 (quoting *Wyzykowski v. Rizas*, 626 A.2d 406, 414 (N.J. 1993)).  Such discernible criteria in our jurisprudence belies the majority opinion's assertion that "pars[ing]" the meaning of direct and indirect contractual interests "is fraught with peril."  In addition, apart from considerations of original public meaning, *Hanig* demonstrates that "direct or indirect" does not categorically ban "any" interest but, instead, refers to the *manner* in which the interest arises.

[¶93.]    Notably, the *Hanig* criteria do not encompass all potential interests but, rather, focus on whether "an individual's judgment may be affected."  *Id.* ¶ 19, 692 N.W.2d at 209.  Undoubtedly, the meaning of interest cannot be so broad as to "render vast sectors of our society ineligible for service in our Legislature."  *Jones v. Howell*, 827 So. 2d 691, 701 (Miss. 2002).  Textually, under the definitions of

"interest" discussed above, a legislator cannot be "interested" if the legislator's judgment is unlikely to be affected.[27] Thus, as the Attorney General argued before this Court at oral argument, there must be a threshold inquiry as to whether the interest at issue is "too remote to constitute a conflict." *See Todd*, S.D. Op. Atty. Gen. 202.[28] Such a determination will necessarily turn on the unique facts of each case, as it inevitably must in any endeavor involving potential conflicts of interest.

### *A Test Based on the Constitutional Text*

[¶94.]    In summary, the textual analysis of Article III, § 12 leads to a consistent and workable test that honors the original public meaning of the constitutional provision and is consistent with our historical jurisprudence concerning appropriations. When a legislator is confronted with a potential conflict of interest, the legislator should perform the following practical and objective analysis:

1.    Is the legislator interested in a government contract to such an extent that the direct or indirect interest at issue might reasonably influence the exercise of the legislator's official duties?

2.    If so, was legislation passed during the legislator's term a but-for cause of the contractual interest?

---

27.    For example, at-large benefits—such as airports—that are generally available to the public are unlikely to generate an impermissible conflict of interest.

28.    In the Michigan constitution, this is made explicit: "No member of the legislature nor any state officer shall be interested directly or indirectly in any contract with the state or any political subdivision thereof *which shall cause a substantial conflict of interest*." Mich. Const. art. IV, § 10(1) (emphasis added).

If the answer to both inquiries is "yes," then Article III, § 12 is implicated, and the legislator must forego the interest unless one year has passed since the legislator's term of office ended.

[¶95.]     Legislators and other public officials laudably desire clear direction to guide them in discerning the existence of disqualifying conflicts of interest, but the majority opinion's test may not provide that guidance in every instance. It is relevant to note that, according to the Governor's Request, "[t]wo attempts have been made to amend the contract section of Article III, § 12, to clarify its broad scope, and two other attempts have been made to repeal it." These attempts having failed, this Court has now been asked to revisit our jurisprudence concerning Article III, § 12. Rather than interpret our Constitution in a fashion not supported by the text, I would stand on our existing precedent.

[¶96.]     The original public meaning of this constitutional provision is clear. It extends to "any contract" authorized by "any law," without exempting general appropriations. The text also requires a proper understanding of whether a legislator is truly interested "directly or indirectly" in a government contract. The majority opinion attempts to create a bright-line rule by exempting general appropriations and prohibiting any interest outside of that exception. But such a rigid standard is unmoored from the original public meaning of Article III, § 12 and may ultimately prove problematic. The reversal of our existing precedent may not provide the clarity desired by the Legislature for the reasons expressed above. What is at stake, ultimately, is the public's confidence in the integrity of the Legislature, which must operate in the public's best interest without being

influenced by the individual legislator's own pecuniary interests—direct or indirect. Article III, § 12 and our existing precedent provides that guidance, and the Attorney General's office is available to assist public officials in difficult cases to determine the nature of their interest and whether it is disqualifying. For the foregoing reasons, I respectfully dissent.