#31355
**2026 S.D. 7**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

#31355

IN RE: THE REQUEST OF SOUTH DAKOTA GOVERNOR
LARRY RHODEN FOR AN ADVISORY OPINION IN THE MATTER
OF THE INTERPRETATION OF THE SOUTH DAKOTA CONSTITUTION
REGARDING THE LIEUTENANT GOVERNOR'S POWER TO VOTE
ON FINAL PASSAGE OF LEGISLATION IN THE CASE OF A TIE WHILE
SERVING AS PRESIDENT OF THE SENATE.

* * * *

ORIGINAL PROCEEDING

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 9, 2026
OPINION FILED **02/18/26**

#31355

AN OPINION REQUESTED BY HIS EXCELLENCY, LARRY RHODEN, THE GOVERNOR OF THE STATE OF SOUTH DAKOTA, PURSUANT TO ARTICLE V, § 5 OF THE SOUTH DAKOTA CONSTITUTION

[¶1.] Citing Article V, § 5 of the South Dakota Constitution, Governor Larry Rhoden asked for an advisory opinion on a question concerning the Lieutenant Governor's constitutional authority to cast a tie-breaking vote on final passage of a bill or joint resolution while serving as the President of the Senate. We issued an order directing the Governor and Senate Leadership to submit briefs to assist us in providing the following response.

**Background**

[¶2.] The Governor's question was prompted by proceedings in the Senate related to SB 25 during the 2026 legislative session. On January 22, 2026, a vote on the final passage of SB 25 resulted in a tie vote of 17 yeas, 17 nays, and one excused. The one excused vote reflected the absence of a senator who had not been present since the opening of the session on January 13, 2026. The Governor asserted in his question that the senator is not expected to return, leaving an even number of senators when all others are present. Due to the tie vote, Lieutenant Governor Tony Venhuizen, acting as President of the Senate, cast a tie-breaking vote in favor of the bill and declared it passed. A senator noticed an intent to move to reconsider the result by which SB 25 had passed.

[¶3.] In the Senate the next day, before the motion to reconsider SB 25 was offered, Senator Chris Karr raised a point of order. He questioned the President's declaration that SB 25 had passed, disputing the President's ability to cast a tie-breaking vote on final passage of a bill. The President provided the basis for his

-1-

ruling. Senator Karr challenged the ruling and described his reasons. The Senate voted to support Senator Karr's challenge, overruling the President's vote. This meant that SB 25 failed. A senator then noticed an intent to reconsider the vote by which SB 25 lost. On January 26, 2026, the vote to reconsider SB 25 was successful, and an amendment was passed. The bill, as amended, passed by a majority vote.

[¶4.] The same day as the passage of SB 25, Governor Rhoden presented his request for an advisory opinion, which he framed as follows:

> Does the state Constitution grant the Lieutenant Governor while serving as the President of the Senate the authority to cast a tie-breaking vote on final passage of a bill or joint resolution in the Senate?

[¶5.] The two relevant constitutional provisions are Article III, § 18 and Article IV, § 5. In pertinent part, Article III, § 18 provides that "no law shall be passed unless by assent of a majority of all the members elected to each house of the Legislature." Article IV, § 5 provides that "[t]he lieutenant governor shall be president of the senate but shall have no vote unless the senators be equally divided." The question presented is whether the tie-breaking power vested in the Lieutenant Governor in Article IV, § 5 includes the power to cast a tie-breaking vote on final passage of a bill that would become law pursuant to Article III, § 18.

## Analysis and Opinion

### *Original jurisdiction to answer the question presented*

[¶6.] The South Dakota Constitution gives the Governor "authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of his executive power and upon solemn occasions." S.D. Const. art. V,

§ 5. "We have interpreted the text of Article V, § 5 disjunctively to allow advisory opinions in instances involving the exercise of the Governor's executive power or those which present solemn occasions." *In re Noem* (*Noem II*), 2024 S.D. 11, ¶ 9, 3 N.W.3d 465, 471; *see also In re Daugaard*, 2016 S.D. 27, ¶ 7, 884 N.W.2d 163, 166 (noting the two separate phrases in Article V, § 5 that are preceded by the term "upon"). Because the attorney general is the executive's legal advisor, "a gubernatorial request for an advisory opinion by the Supreme Court is limited to the 'rarest instances.'" *Daugaard*, 2016 S.D. 27, ¶ 3, 884 N.W.2d at 165 (quoting *In re House Resol. No. 30*, 72 N.W. 892, 892 (S.D. 1897)).

[¶7.]    The first instance where the Governor may request an advisory opinion is in relation to "important questions of law" involving "the exercise of [the Governor's] executive power." S.D. Const. art. V, § 5. Because Governor Rhoden's question does not implicate his executive power, we do not respond under this provision.

[¶8.]    The second instance where the Governor may request an advisory opinion is upon "solemn occasions." *Id.* We have previously discussed eight factors that may guide our determination of whether the question posed by the Governor is a solemn occasion:

> [1] whether an important question of law is presented, [2] whether the question presents issues pending before the Court, [3] whether the matter involves private rights or issues of general application, [4] whether alternative remedies exist, [5] whether the facts and questions are final or ripe for an advisory opinion, [6] the urgency of the question, [7] whether the issue will have a significant impact on state government or the public in general, and [8] whether the Court has been provided with an adequate amount of time to consider the issue.

*Noem II*, 2024 S.D. 11, ¶ 17, 3 N.W.3d at 472–73 (quoting *Daugaard*, 2016 S.D. 27, ¶ 13, 884 N.W.2d at 167).

[¶9.] Utilizing those considerations, we have recognized solemn occasions when the Governor requested various interpretations of his veto power under Article IV, § 4. *See, e.g.*, *In re Janklow (Janklow I)*, 1999 S.D. 27, ¶ 1, 589 N.W.2d 624, 625; *In re Janklow (Janklow II)*, 2000 S.D. 106, ¶ 6, 615 N.W.2d 618, 620; *In re Rounds*, 2003 S.D. 30, ¶ 3, 659 N.W.2d 374, 376. To resolve these questions and provide a complete interpretation of the relevant constitutional provisions, the Court had to examine provisions in Article III concerning the Legislature. *See, e.g.*, *Janklow I*, 1999 S.D. 27, ¶ 7, 589 N.W.2d at 627; *Janklow II*, 2000 S.D. 106, ¶ 7, 615 N.W.2d at 620–21; *Rounds*, 2003 S.D. 30, ¶ 3, 659 N.W.2d at 376.

[¶10.] Our most recent advisory opinions have addressed matters that involved significant examination of Article III, § 12 concerning the prohibition of legislators from being "interested, directly or indirectly, in any contract with the state or any county thereof, authorized by any law passed during the term for which he shall have been elected." *In re Noem (Noem I)*, 2020 S.D. 58, 950 N.W.2d 678; *Noem II*, 2024 S.D. 11, 3 N.W.3d 465. Notwithstanding the necessity of examining a provision governing the standards for serving as a legislator, the questions posed by Governor Noem in both instances were not only questions of law involved in the exercise of her executive power, but also solemn occasions.

[¶11.] Despite this history, the Senate Leadership urges us not to answer the Governor's request because they contend that doing so would cause us to invade the Senate's authority to "superintend its own affairs." In support of this position, they

rely primarily on *In re Construction of Constitution*, 54 N.W. 650 (S.D. 1893). In that case, Governor Sheldon requested an advisory opinion regarding this Court's interpretation of the meaning and intent of Article III, § 18 of the South Dakota Constitution. *In re Constr. of Const.*, 54 N.W. at 651. However, the request was initiated by a joint resolution of the Legislature, which requested Governor Sheldon to obtain the Court's opinion. *Id.* Specifically, the Legislature sought an opinion about a question of "parliamentary procedure" involving a ruling made by the Lieutenant Governor acting in his role as President of the Senate. *Id.* This Court determined that the proffered question involved a matter that rested solely on the judgment of the legislative branch, and that its "judgment must be final until it shall be called in question through the usual avenue provided for testing it." *Id.* at 652.

[¶12.] Using language that was perhaps broader than intended, this Court stated that our authority to issue advisory opinions "is confined exclusively to such questions as may raise a doubt in the executive department,—never in the legislative. Were we to construe it otherwise, it would be liable to become the medium of great abuse." *Id.* The intended import of that language was merely that the Court's authority to issue advisory opinions did not extend to questions involving the internal administration of legislative procedure.

[¶13.] Unlike the question presented in that 1893 case, Governor Rhoden's request is not a question posed by the Legislature requesting an interpretation of its internal rules. *See In re Constr. of Const.*, 54 N.W. at 651; *see also Matter of Constr. of Article III, Section 5*, 464 N.W.2d 825, 827 (S.D. 1991) (declining to

answer a request for an advisory opinion prompted by the Redistricting Preparation Committee of the Legislature that would have effectively been an opinion for the committee, rather than the Governor). Article III, § 9 of the South Dakota Constitution provides, in part, that "[e]ach house shall determine the rules of its proceedings, shall choose its own officers and employees and fix the pay thereof, *except as otherwise provided in this Constitution.*" (Emphasis added.)

[¶14.] Instead, the proffered question requires the construction and interpretation of two provisions of the South Dakota Constitution. The legislative and executive branches differ in their interpretation of the two relevant constitutional provisions. As the final arbiters of the meaning of the South Dakota Constitution, this Court has a responsibility to resolve this issue.[1] *See S.D. Auto. Club, Inc. v. Volk*, 305 N.W.2d 693, 700 (S.D. 1981) ("[I]t is the duty of this court, not the legislature, to make determinations of constitutional terms."). The Lieutenant Governor's authority to cast a tie-breaking vote in the Senate derives solely from the Constitution, and it cannot be restricted or enlarged by the Senate's internal rules. Consequently, to answer the proffered question, we need not interpret or apply any internal legislative rules.

[¶15.] We conclude that the Governor has posed a question involving a solemn occasion. The Governor has presented a question of law unrelated to any

---

1. It is because of these conflicting views that we invited briefing from the Governor and the Senate Leadership. However, we emphasize that our recent practice of requesting or inviting briefing from those outside of the Governor's office is not intended to transform advisory opinion requests into contested adversarial proceedings. Our request in this instance, as in *Noem II*, was based upon a need to develop "our understanding of the legal issue we confront[ed]." 2024 S.D. 11, ¶ 21, 3 N.W.3d at 473.

other issues pending before the Court.  It is a question of general application without reference to any bill or factual scenario other than the occurrence of a tie vote in the Senate.  The existence of any possible alternative remedy does not weigh against taking up this question.  Although there is no current controversy involving a bill passed through the Senate by virtue of a tie-breaking vote cast by the Lieutenant Governor, the issue may arise again with the current composition of the Senate this session.  If left unresolved, a lack of clarity on this issue could negatively impact state government and the public.  Perhaps more to the point, not answering the Governor's question would effectively allow the Senate to act as the sole arbiter of the Lieutenant Governor's constitutional authority to cast a tie-breaking vote—an adjudicative role reserved uniquely for this Court.  *See id.*  The facts and circumstances are undisputed, and the issue is ripe for our consideration. We have adequate time to consider the issue because, although this Court has not addressed a similar question, we have the benefit of well-developed rules of constitutional interpretation and persuasive decisions from other jurisdictions.

### *Reconciling Article IV, § 5 and Article III, § 18 of the South Dakota Constitution*

[¶16.]        "When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted." *Betty Jean Strom Tr. v. SCS Carbon Transp., LLC*, 2024 S.D. 48, ¶ 53, 11 N.W.3d 71, 90 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J.,

concurring in part)).[2] The text of the relevant constitutional provisions is preeminent in this Court's assessment of its meaning. *Doe v. Nelson*, 2004 S.D. 62, ¶ 9, 680 N.W.2d 302, 305 ("The words used in the Constitution are to be taken in their natural and obvious sense, and are to be given the meaning they have in common use unless there are very strong reasons to the contrary." (citation omitted)); *see also Janklow I*, 1999 S.D. 27, ¶ 5, 589 N.W.2d at 626 ("When words in a constitutional provision are clear and unambiguous, they are to be given their natural, usual meaning and are to be understood in the sense in which they are popularly employed." (citation omitted)).

[¶17.]     This Court has identified other principles that may guide its interpretation of the relevant constitutional provisions. "[I]n construing a constitutional provision, [this Court] must give regard to the whole instrument, must seek to harmonize the various provisions, and must, if possible, give effect to all the provisions." *S.D. Auto. Club*, 305 N.W.2d at 696 (citing *Bd. of Regents v. Carter*, 228 N.W.2d 621 (1975)). Similarly, this Court will not interpret the Constitution so as to render any provision or phrase meaningless. *In re McKennan's Est.*, 126 N.W. 611, 617 (S.D. 1910) ("Constitutions are supposed to be prepared with much care and deliberation. It will not do to assume that such important instruments contain any idle or meaningless phrases."). In the context of statutory

---

2.     The briefs submitted by the Governor and Senate Leadership do not rely on contemporaneous debates to inform our interpretation of the relevant constitutional provisions. Likewise, our review of the relevant constitutional proceedings does not reveal any significant discussion that would aid in our interpretation. Consequently, we draw our understanding of the intent of the provisions from the language the drafters used.

interpretation, we apply the principle that "where more than one statute touches upon the same subject matter, we presume that the statute with the more specific language 'relating to a particular subject will prevail over the general terms of another statute.'" *Lewis & Clark Rural Water Sys., Inc. v. Seeba*, 2006 S.D. 7, ¶ 63, 709 N.W.2d 824, 841 (quoting *Martinmaas v. Engelmann*, 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611). The same principle applies when interpreting two constitutional provisions that touch on the same subject matter. *See In re Est. of Colombe*, 2016 S.D. 62, ¶ 28, 885 N.W.2d 350, 358 (noting that the Court applies "general rules of statutory construction" when analyzing the constitution (citation omitted)).

[¶18.] Article III of the South Dakota Constitution relates to legislative responsibilities and authorities. Article III, § 18 was part of the original 1889 South Dakota Constitution and has not been amended since its adoption. This provision is a basic expression of a bicameral legislative design: a bill must gain a majority in both houses to become law.

[¶19.] Article IV of the South Dakota Constitution articulates executive responsibilities and authorities. The text of Article IV, § 5, as originally stated in the 1889 South Dakota Constitution, provided, in relevant part, "The lieutenant governor shall be president of the senate, but shall only have a casting vote therein." Contemporaneous to the adoption of the 1889 Constitution, a "casting vote" was defined as: "Where the votes of a deliberative assembly or legislative body are equally divided on any question or motion, it is the privilege of the presiding officer to cast one vote (if otherwise he would not be entitled to any vote) on either side, or to cast one additional vote if he has already voted as a member of the body."

*Casting Vote*, Black's Law Dictionary (1st ed. 1891). Article IV, § 5 took its current form in 1972: "The lieutenant governor shall be president of the senate but shall have no vote unless the senators be equally divided." 1972 S.D. Sess. Laws ch. 1, § 2. In 1974, 1976, and 1986, there were unsuccessful attempts to repeal the Lieutenant Governor's voting power. 1974 S.D. Sess. Laws ch. 1, § 3; 1975 S.D. Sess. Laws ch. 2, § 3, as amended by 1976 S.D. Sess. Laws ch. 1; 1985 S.D. Sess. Laws ch. 2, § 2.

[¶20.] Implicit in the text of Article III, § 18 is the general principle that only members of the Senate may ordinarily vote on the passage of a law.[3] Although the Lieutenant Governor is not an elected member of the Senate, Article IV, § 5 directs that the Lieutenant Governor shall be the President of the Senate and explicitly authorizes the Lieutenant Governor to vote when necessary to break a tie. Article IV, § 5 and Article III, § 18 do not stand in conflict. Instead, the two provisions complement one another. *See S.D. Auto. Club*, 305 N.W.2d at 696 (explaining that this Court "must seek to harmonize the various provisions" and "if possible, give effect to all" of them).

[¶21.] Article III, § 18 describes what is required before a law may be passed—"assent of a majority of all members elected to each house of the

---

3. The Senate Leadership suggests that the phrase "members elected" in Article III, § 18 confines the voting on final passage to only members elected to the Senate, which they contend necessarily excludes the Lieutenant Governor. However, when vacancies arise, the Governor is empowered to make appointments to fill these vacancies. Article III, § 10. Under the Senate Leadership's logic, appointed members of each house would also be prohibited from voting on the final passage of legislation because they, like the Lieutenant Governor, have not been elected to the Senate.

Legislature." Article IV, § 5 is more specific and expressly addresses a discrete situation in which a majority vote in the Senate is not obtained due to a tie. Article IV, § 5 resolves this impasse by allowing the Lieutenant Governor to cast a vote, thereby providing a method by which a majority can be obtained. Construing the text of the two relevant constitutional provisions together, we conclude that the Lieutenant Governor may cast a tie-breaking vote on the final passage of a bill. This interpretation gives both provisions effect and meaning.

[¶22.] The suggestion that the Lieutenant Governor may not vote on the final passage of a bill presents other interpretive problems. Article III, § 18 describes what is required for a law to be passed, but it does not express any limit on the voting power of the Lieutenant Governor. To find such a limitation in that section would require us to read language into the Constitution that does not exist, which we cannot do. *In re Est. of Flaws*, 2016 S.D. 60, ¶ 44, 885 N.W.2d 336, 349 ("We 'cannot add language that simply is not there.'" (citation omitted)). Similarly, Article IV, § 5 does not distinguish between different kinds of votes and does not contain any language limiting the Lieutenant Governor's vote to matters that do not involve final passage. The only textual condition for the Lieutenant Governor's vote is that "the senators be equally divided."[4] Had the drafters of Article IV, § 5

---

4. The Senate Leadership suggests that the phrase "equally divided" in Article IV, § 5 needs to be interpreted and/or clarified. However, we conclude that the phrase can mean only one thing: an equal number of Senators voted for and against a matter. The word "senators," as used in the first sentence of Article IV, § 5 can only refer to the senators who vote on a matter and does not include senators who are absent or excused from voting. This is so because the provision contemplates the senators being "divided," and the way the senators may be "divided" is if they vote on a matter. In our view, we are

(continued . . .)

intended to limit the Lieutenant Governor's tie-breaking power, they could have indicated that intent in the text.[5]  But Article IV, § 5 contains no such indication, and we cannot interpret the Constitution to include language that is not there.  *In re Est. of Flaws*, 2016 S.D. 60, ¶ 44, 885 N.W.2d at 349.

[¶23.]        "[A]lthough we must address questions of constitutional interpretation 'autonomously [to] develop a coherent body of South Dakota constitutional law,' we do look to other states for guidance."  *Gilbert v. Flandreau Santee Sioux Tribe*, 2006 S.D. 109, ¶ 22, 725 N.W.2d 249, 258 (second alteration in original) (citation omitted).  Other states that have addressed this question take two approaches.  The majority view holds that when a Senate vote results in a tie, or when the senators are equally divided, the Lieutenant Governor may cast a tie-breaking vote, regardless of whether the vote is on the final passage of a bill.[6]  The second view holds that the Lieutenant Governor may not cast a tie-breaking vote on the final passage of legislation because the Lieutenant Governor is not elected to the Senate,

---

(. . . continued)
        obligated to apply this plain and unambiguous text as it is written.  *Janklow I*, 1999 S.D. 27, ¶ 5, 589 N.W.2d at 626.

5.      The Pennsylvania Constitution provides an example of such language.  P.A. Const. art. IV, § 4 ("As such, [the lieutenant governor] may vote in case of a tie on any question *except the final passage of a bill*[.]" (emphasis added)).

6.      The first group is typified by *Advisory Opinion on Constitutionality of 1978 PA 426*, 272 N.W.2d 495, 496 (Mich. 1978) ("The Lieutenant Governor may cast a tie-breaking vote during the final consideration of a bill when the Senate is equally divided, pursuant to [Michigan's relevant constitutional provisions].");  *see also Op. of the Justs.*, 225 A.2d 481, 485 (Del. 1966);  *State ex rel. Easbey v. Highway Patrol Bd.*, 372 P.2d 930, 939 (Mont. 1962).

and only elected members may vote on final passage.[7]  The analysis employed in the first line of cases is persuasive and consistent with our interpretation of these two provisions of the South Dakota Constitution.

[¶24.]    We answer the question submitted by the Governor in the affirmative—the South Dakota Constitution empowers the Lieutenant Governor, while serving as President of the Senate, to cast a tie-breaking vote in the Senate on any matter.

Respectfully submitted this 18th day of February 2026.

_____
Steven R. Jensen, Supreme Court Chief Justice

_____
Mark E. Salter, Supreme Court Justice

_____
Patricia J. DeVaney, Supreme Court Justice

_____
Scott P. Myren, Supreme Court Justice

_____
Robert Gusinsky, Supreme Court Justice

---

7.    The second approach is typified by *Center Bank v. Department of Banking & Finance*, 313 N.W.2d 661, 663 (Neb. 1981) ("The Lieutenant Governor is eligible to vote on all other questions before the Legislature, when it is equally divided," except regarding a vote on final passage of a bill.).  Three members of the court dissented and would have concluded that the lieutenant governor was entitled to cast a tie-breaking vote on the final passage of the bill.  *Id.* at 232–37 (Krivosha, C.J., concurring in the result and dissenting in part).